IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEVADA

| | | |
|---|---|---|
| CHARLES ALLEN, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | CV. NO. 03-01358-DAE-RJJ |
| | ) | |
| UNITED STATES OF AMERICA, et al., | ) | |
| | ) | |
| Defendants. | ) | |

ORDER: 1) GRANTING DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT; 2) GRANTING IN PART AND DENYING WITHOUT
PREJUDICE IN PART DEFENDANTS' MOTION TO DISMISS OR, IN THE
ALTERNATIVE, FOR SUMMARY JUDGMENT; AND 3) DENYING AS
MOOT DEFENDANTS' MOTION TO STRIKE

On July 24, 2013, the Court heard Defendants' Motion for Summary

Judgment Regarding the Remaining Claim of Plaintiffs Lori Kahre and Lee

Belcher (doc. # 350); Defendants' Motion to Dismiss or, in the Alternative, for

Summary Judgment (doc. # 369); and Defendants' Motion to Strike (doc. # 336).

Lisa A. Rasmussen, Esq., appeared at the hearing on behalf of Plaintiff Robert

Kahre; E. Brent Bryson appeared at the hearing on behalf of Plaintiffs Lori Kahre

and Lee Belcher; and Charles M. Duffy, Esq., appeared at the hearing on behalf of

Defendants.  After reviewing the Motions and the supporting and opposing

memoranda, the Court **GRANTS** the Motion for Summary Judgment, **GRANTS**

1

**IN PART** and **DENIES WITHOUT PREJUDICE IN PART** the Motion to

Dismiss or, in the Alternative, for Summary Judgment, and **DENIES AS MOOT**

the Motion to Strike.

<u>BACKGROUND</u>

I.      <u>Factual Allegations</u>

Plaintiffs describe themselves as a group of individuals boycotting the

Federal Reserve System by using gold and silver coins manufactured by the United

States mint as a medium of exchange, "thereby avoiding income taxes based on the

exchange rate between gold and silver dollars and Federal Reserve Notes

denominated as if they were dollars."  ("SAC," Doc. # 104 at 3.)  Plaintiffs filed

suit against an Assistant United States Attorney in the Department of Justice

("DOJ"), Special Agents of the Internal Revenue Service ("IRS"), federal strike

force/SWAT team members, and North Las Vegas Police Department (NLVPD)

officers, alleging numerous constitutional violations.  (<u>Id.</u> ¶¶ 3–20.)  Plaintiff's

allegations arise primarily out of searches conducted by Defendants at three

locations in Las Vegas, Nevada on May 29, 2003.  Specifically, the Second

Amended Complaint ("SAC") alleges that Defendants retaliated against Plaintiffs

for engaging in protected First Amendment activity (<u>id.</u> ¶¶ 21–27); used excessive

force, unreasonably detained Plaintiffs, and engaged in the unnecessary destruction

of property and other misconduct in the execution of search warrants, in violation

2

of the Fourth Amendment (id. ¶¶ 27–39); violated Plaintiffs' Fifth and Fourteenth

Amendment right to due process and freedom from compelled self-incrimination

by using grand jury proceedings to elicit evidence for use in civil tax cases (id.

¶¶ 62–65), utilizing warrant-less arrests and excessive force to coerce bystanders to

submit to interrogations (id. ¶¶ 66–71), and failing to serve search warrants to

lawful tenants of property being searched (id. at ¶¶ 72–74); and, finally, conspired

to violate Plaintiffs' First and Fourth Amendment rights (id. ¶¶ 75–77).  After

years of litigation and several dispositive motions, some plaintiffs have been

dismissed from the proceedings, some have chosen not to proceed with this

litigation, and many of the remaining plaintiffs' claims have been disposed of.

II.    Procedural History

On October 30, 2003, Plaintiffs filed their first complaint seeking

injunctive relief against the United States and damages against unknown individual

federal employees and State of Nevada employees pursuant to Bivens v. Six

Unknown Fed. Narcotics Agents ("Bivens"), 403 U.S. 388 (1971) and 42 U.S.C.

§ 1983 as well as Nevada state law.  (Doc. # 1.)  On February 18, 2004, the

Defendants filed Motions to Dismiss pursuant to Federal Rules of Civil Procedure

12(b)(1) and (6) or, in the alternative, for Summary Judgment ("2004 Motions").

(Docs. ## 20–21.)  On August 12, 2004, Plaintiffs filed their First Amended

Complaint.  (Doc. # 53.)  On October 4, 2004, United States District Judge Philip

M. Pro granted in part and denied in part Defendants' 2004 Motions.  ("Pro

Order," Doc. # 56.)

        In his Order, Judge Pro found that under Ninth Circuit precedent, "no

Bivens action may lie for any alleged constitutional violation stemming from the

assessment and collection efforts of IRS agents whenever there [are] meaningful

and adequate protections available to the plaintiff" under the Tax Equity and Fiscal

Responsibility Act of 1982 ("TEFRA").  (Pro Order at 9.)  Accordingly, he

dismissed all claims against IRS agents regarding alleged violations of First

Amendment rights and claims regarding the seizure of Robert Kahre's gold, silver

and other currency to satisfy unpaid federal tax obligations.  (Id. at 11, 23.)  Judge

Pro found that Robert Kahre was not present when the challenged search warrants

were executed and thus did not have standing to challenge the defendants' failure

to knock and announce and to present the warrant.  (Id. at 10–11.)  Judge Pro also

dismissed Robert Kahre's claims regarding the sufficiency of the search warrant,

all claims arising from alleged violations of the Fifth Amendment protection

against self-incrimination, and claims against Assistant United States Attorney

("AUSA") Gregory Damm ("Damm") relating to the drafting of the search warrant

application and supporting affidavit.  (Id. at 24.)  Judge Pro denied the Defendants

qualified immunity with respect to certain plaintiffs' claims for unreasonable

detention and excessive force relating to a search at 6270 Kimberly Avenue, and

Plaintiff Lori Kahre's allegations that the defendants unlawfully entered her residence and detained her.  (Id. at 16, 19.)  Judge Pro found that Defendant Damm was not entitled to absolute immunity with respect to allegations that he planned every aspect of an unlawful raid, and denied Defendant IRS Agent Jared Halper ("Halper") qualified immunity on Robert Kahre's unlawful arrest claim.  (Id. at 20–21, 24.)

Plaintiffs filed their Second Amended Complaint on November 14, 2005.  (SAC.)  The SAC named the following defendants: AUSA Damm; IRS Agents Halper, Mercedes Manzur, and Dennis Crowther ("Crowther"); and officers with the NLVPD.  In an Order dated May 22, 2006, the Court concluded that Plaintiffs' claims against the NLVPD officers were barred by the statute of limitations, and therefore dismissed the state defendants from the lawsuit.  (Doc. # 142.)

On April 5, 2005, a federal grand jury returned an indictment against the majority of the Plaintiffs for charges relating to tax evasion.  (Cr. 2:05–CR–00121–DAE–RJJ, Doc. # 1.)  On July 12, 2005, the Court stayed discovery proceedings pending resolution of the criminal cases against eleven of the Plaintiffs in the instant action.  (Doc. # 99.)  On November 14, 2005, Plaintiffs filed a Second Amended Complaint.  (SAC.)  On August 29, 2006, the Court refused to grant Plaintiffs leave to file a third amended complaint.  (Doc. # 154.)

On February 23, 2007, Plaintiff Robert Kahre commenced another lawsuit against many of the same Defendants in the instant case, alleging numerous Racketeer Influenced and Corrupt Organizations (RICO) violations.[2]  (See Cv. 2:07–CV–00231–DAE–RJJ.)

   In 2009, three of the remaining Plaintiffs were adjudged guilty in their criminal cases.  (See Cr. 2:05–CR–00121–RCJ–RJJ.)  Specifically, John Kahre pleaded guilty to five counts of willfully attempting to evade and defeat tax (see Cr. 2:05–CR–00121–RCJ–RJJ, Docs. ## 605, 2614); Robert Kahre was found guilty of multiple counts of conspiracy to defraud, willfully failing to collect and pay over tax, attempting to interfere with the administration of the Internal Revenue law, attempting to evade and defeat tax, and wire fraud (see Cr. 2:05–CR–00121–RCJ–RJJ, Docs. ## 1671, 2615); and Lori Kahre was found guilty of multiple counts of conspiracy to defraud, attempting to interfere with the administration of the Internal Revenue law, making a false statement to a bank and attempting to evade and defeat tax (see Cr. 2:05–CR–00121–RCJ–RJJ, Docs. ## 1671, 2623).

   The Court sua sponte lifted the stay in these proceedings on September 7, 2010.  (Doc. # 225.)  Only three Plaintiffs elected to proceed: Robert

---

[2] This Court ultimately dismissed the myriad claims in that suit (Cv. 2:07–CV–00231–DAE–RJJ, Doc. # 95), and was affirmed on appeal by the Ninth Circuit (Cv. 2:07–CV–00231–DAE–RJJ, Doc. # 107).

Kahre, Lori Kahre, and Lee Belcher ("Belcher").  (Doc. # 300 at 19.)  On

November 15, 2010, the Defendants filed a Motion to Dismiss or, in the

Alternative, for Summary Judgment ("Defendants' 2010 Motion").  (Doc. # 254.)

In its Order addressing Defendants' 2010 Motion, the Court identified five

categories of claims that had not been dismissed in the Pro Order granting in part

and denying in part Defendants' 2004 Motions:

1. Plaintiffs' claims for unreasonable detention arising from the execution of a search warrant at Kimberly Avenue;
2. Plaintiffs' claims of excessive force by federal agents during the execution of a search warrant at Kimberly Avenue;
3. Plaintiff Robert Kahre's claim for unlawful arrest against Defendant Halper;
4. Plaintiffs' claims against Defendant Damm for the alleged planning of unlawful raids;
5. Plaintiff Lori Kahre's claim of unreasonable search and seizure.

(Doc. # 300 at 20.)

        The Court determined that Defendants were entitled to summary

judgment with respect to the alleged misconduct at Kimberly Avenue, thus

disposing of the unreasonable detention and excessive force claims stemming from

the execution of the search warrant at that location.  (Id.)  The Court noted that

none of the remaining plaintiffs, including Robert Kahre, were present at Kimberly

Avenue when the alleged misconduct took place, and thus "[did] not have standing

to seek redress for constitutional injuries that other individuals sustained there."

(Id. at 21–22.)  The Court denied Defendants' 2010 Motion with respect to Robert

7

Kahre's unlawful arrest claim, Lori Kahre's claim that federal agents unlawfully searched her residence, and the claim that AUSA Damm planned unlawful raids. (Id. at 23, 28.)  The Court found that Plaintiffs were entitled to a continuance for purposes of conducting further discovery as to those claims.  (Id. at 28.)

The Defendants then filed a Motion for Partial Summary Judgment as to Robert Kahre's wrongful arrest claim on September 29, 2011.  (Doc. # 301.)  On April 24, 2012, after a hearing on the Motion, the Court issued an Order Granting Defendants' Motion for Partial Summary Judgment, thereby disposing of Robert Kahre's wrongful arrest claim.  (Doc. # 319.)  On May 25, 2012, Robert Kahre filed a Motion for Reconsideration of this Court's April 24, 2012 Order.  (Doc. # 325.)  On November 13, 2012, the Court denied the Motion for Reconsideration. (Doc. # 354.)

On May 21, 2012, Defendants moved to dismiss Plaintiff Robert Kahre and Defendant Halper from the case on the ground that Robert Kahre's last remaining claim—the wrongful arrest claim, which was also the last claim against Halper—was disposed of by the Court's Order Granting Defendants' Motion for Partial Summary Judgment (doc. # 319).  (Doc. # 321.)  Robert Kahre contended that he has live claims remaining in the case, including Fourth and Fifth Amendment claims for destruction of property and a claim that Defendant Damm planned unlawful raids in retaliation for Plaintiffs' protected First Amendment

activity.  (Doc. # 328.)  The Court denied Defendants' Motion, concluding that Robert Kahre's claim against Defendant Damm for planning unlawful raids appears to still be live.  (Doc. # 363.)  Observing that the SAC is lengthy and contains numerous claims and noting the long and complicated history of this litigation, the Court instructed Robert Kahre to submit a list of claims he still wishes to pursue and believes survive the Court's prior rulings.  (Id. at 13.)  On December 26, 2012, Robert Kahre complied, submitting a Notice of Remaining Claims.  (Doc. # 366.)  The Notice stated that Robert Kahre believes the following claims remain live:

1. A First Amendment retaliation claim against Defendant Damm;
2. Fourth and Fifth Amendment destruction of property claims;
3. Fourth Amendment unlawful and unreasonable detention claims;
4. Fourth and Fifth Amendment claims against Defendants Damm and Halper for planning an unlawful raid.

(Doc. # 366 at 11–13.)

On November 6, 2012, Defendants filed a Motion for Summary Judgment Regarding the Remaining Claim of Plaintiffs Lori Kahre and Lee Belcher (doc. # 350), and on January 25, 2013, Defendants filed a Motion to Dismiss All Remaining Claims or, in the Alternative, for Summary Judgment, in response to Robert Kahre's Notice of Remaining Claims (doc. # 369).  These two motions are currently before the Court.  On February 11, 2013, Robert Kahre filed a response in opposition to Defendants' January 25, 2013 motion (doc. # 380), and

9

on February 28, 2013, Defendants filed a reply (doc. # 386).  On June 18, 2013, the attorney for Lori Kahre and Lee Belcher filed a Motion to Withdraw as Counsel, which stated that he had just learned about Defendant's November 6, 2012 Motion for Summary Judgment and wished to withdraw as counsel.  (Doc. # 392.)  The Court denied the Motion to Withdraw but granted Counsel an extension of time to file a response in opposition to the Motion for Summary Judgment.  (Doc. # 394.)  On July 4, 2013, a response was filed (doc. # 395), and on July 12, 2013, Defendants filed a reply in further support of their Motion for Summary Judgment (doc. # 396).

LEGAL STANDARD

I.      Rule 12(b)(6) Motion to Dismiss

          Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure ("Rule"), a motion to dismiss will be granted where the plaintiff fails to state a claim upon which relief can be granted.  Review is limited to the contents of the complaint.  See Clegg v. Cult Awareness Network, 18 F.3d 752, 754 (9th Cir. 1994).  A complaint may be dismissed as a matter of law for one of two reasons: "(1) lack of a cognizable legal theory, or (2) insufficient facts under a cognizable legal claim."  Robertson v. Dean Witter Reynolds, Inc., 749 F.2d 530, 534 (9th Cir. 1984) (citation omitted).  Allegations of fact in the complaint must be taken as true

10

and construed in the light most favorable to the plaintiff.  See Livid Holdings Ltd.
v. Salomon Smith Barney, Inc., 416 F.3d 940, 946 (9th Cir. 2005).

   A complaint need not include detailed facts to survive a Rule 12(b)(6)
motion to dismiss.  See Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555–56 (2007).
In providing grounds for relief, however, a plaintiff must do more than recite the
formulaic elements of a cause of action.  See id. at 556–57; see also McGlinchy v.
Shell Chem. Co., 845 F.2d 802, 810 (9th Cir. 1988) ("[C]onclusory allegations
without more are insufficient to defeat a motion to dismiss for failure to state a
claim.") (citation omitted).  "The tenet that a court must accept as true all of the
allegations contained in a complaint is inapplicable to legal conclusions," and
courts "are not bound to accept as true a legal conclusion couched as a factual
allegation."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (internal quotation marks
and citations omitted).  Thus, "bare assertions amounting to nothing more than a
formulaic recitation of the elements" of a claim "are not entitled to an assumption
of truth."  Moss v. U.S. Secret Service, 572 F.3d 962, 969 (9th Cir. 2009) ("[T]he
non-conclusory factual content, and reasonable inferences from that content, must
be plausibly suggestive of a claim entitling the plaintiff to relief.") (internal
quotation marks and citation omitted).

   A court looks at whether the facts in the complaint sufficiently state a
"plausible" ground for relief.  See Twombly, 550 U.S. at 570.  A plaintiff must

11

include enough facts to raise a reasonable expectation that discovery will reveal

evidence and may not just provide a speculation of a right to relief.  Id. at 586.

When a complaint fails to adequately state a claim, such deficiency should be

"exposed at the point of minimum expenditure of time and money by the parties

and the court."  Id. at 558 (citation omitted).  If a court dismisses the complaint or

portions thereof, it must consider whether to grant leave to amend.  Lopez v.

Smith, 203 F.3d 1122, 1130 (9th Cir. 2000) (finding that leave to amend should be

granted "if it appears at all possible that the plaintiff can correct the defect"

(internal quotations and citations omitted)).

II.     Motion for Summary Judgment

Summary judgment is granted under Federal Rule of Civil Procedure

56 when "the pleadings, the discovery and disclosure materials on file, and any

affidavits show that there is no genuine issue as to any material fact and that the

movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); see also

Porter v. Cal. Dep't of Corr., 419 F.3d 885, 891 (9th Cir. 2005); Addisu v. Fred

Meyer, Inc., 198 F.3d 1130, 1134 (9th Cir. 2000).  A main purpose of summary

judgment is to dispose of factually unsupported claims and defenses.  Celotex

Corp. v. Catrett, 477 U.S. 317, 323–24 (1986).

Summary judgment must be granted against a party that fails to

demonstrate facts to establish what will be an essential element at trial.  See id. at

12

323.  A moving party without the ultimate burden of persuasion at trial—usually, but not always, the defendant—has both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment.  Nissan Fire & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1102 (9th Cir. 2000).  The burden initially falls upon the moving party to identify for the court those "portions of the materials on file that it believes demonstrate the absence of any genuine issue of material fact."  T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987) (citing Celotex Corp., 477 U.S. at 323).

Once the moving party has carried its burden under Rule 56, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial" and may not rely on the mere allegations in the pleadings.  Porter, 419 F.3d  at 891 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)).  In setting forth "specific facts," the nonmoving party may not meet its burden on a summary judgment motion by making general references to evidence without page or line numbers.  S. Cal. Gas Co. v. City of Santa Ana, 336 F.3d 885, 889 (9th Cir. 2003).  "[A]t least some 'significant probative evidence'" must be produced.  T.W. Elec. Serv., 809 F.2d at 630  (quoting First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 290 (1968)).  "A scintilla of evidence or evidence that is merely colorable or not significantly probative does not present a genuine issue of material fact."  Addisu, 198 F.3d at 1134.  Further, the Ninth Circuit has

"refused to find a 'genuine issue' where the only evidence presented is 'uncorroborated and self-serving' testimony." Villiarimo v. Aloha Island Air, Inc., 281 F.3d 1054, 1061 (9th Cir. 2002) (citing Kennedy v. Applause, Inc., 90 F.3d 1477, 1481 (9th Cir. 1996)). "Conclusory allegations unsupported by factual data cannot defeat summary judgment." Rivera v. Nat'l R.R. Passenger Corp., 331 F.3d 1074, 1078 (9th Cir. 2003).

When "direct evidence" produced by the moving party conflicts with "direct evidence" produced by the party opposing summary judgment, "the judge must assume the truth of the evidence set forth by the nonmoving party with respect to that fact." T.W. Elec. Serv., 809 F.2d at 631. In other words, evidence and inferences must be construed in the light most favorable to the nonmoving party. Porter, 419 F.3d at 891. The court does not make credibility determinations or weigh conflicting evidence at the summary judgment stage. Id.; see also Nelson v. City of Davis, 571 F.3d 924 (9th Cir. 2009) ("[C]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.") (citations omitted). However, inferences may be drawn from underlying facts not in dispute, as well as from disputed facts that the judge is required to resolve in favor of the nonmoving party. T.W. Elec. Serv., 809 F.2d at 631.

<u>DISCUSSION</u>

I.      <u>Defendants' Motion to Dismiss all Remaining Claims or, in the Alternative,</u>
        <u>for Summary Judgment</u>

        Defendants seek dismissal of or, in the alternative, summary judgment

on each of the claims Robert Kahre listed in his Notice of Remaining Claims (doc.

# 366).  (Doc. # 369.)   The Court notes, at the outset, that its attempts to resolve

the remaining issues in this case have been stymied by the lack of clarity and

reasoned argument in the parties' briefing.  The Defendants, in particular, seem

disinclined to rely on the <u>law</u> to resolve Robert Kahre's remaining claims, instead

citing primarily to rulings issued in the related criminal case, Cr. 2:05–CR–00121–

DAE–RJJ, and prior rulings in this case, often taken out of context or

misinterpreted.[1]  The Defendants thereby shift the burden of sifting through the

many arguments they have made in prior filings in both this case and Robert

Kahre's criminal case to the Court.  With that said, the Court will assess the

viability of the four claims Defendants seek to dismiss or obtain judgment on.

---

[1] For example, Defendants insist that Judge Pro's October 4, 2004 Order <u>must have</u> disposed of Robert Kahre's property destruction claims because it referred to the alleged destruction.  (Doc. # 369 Ex. 1 at 8.)  Judge Pro's October 4, 2004 Order referred to the property destruction in the "Background" section of Order, a section devoted to summarizing the Plaintiffs' factual allegations.  (Pro Order at 3.)  To suggest that such a reference <u>disposed of</u> Robert Kahre's property destruction claim on its merits is at best wishful thinking.

A.    <u>First Amendment Retaliation Claim</u>

The SAC asserts that Defendants retaliated against Robert Kahre "for exercise of his clearly established First Amendment right to associate with his co-plaintiffs to boycott the Federal Reserve and criticize the monetary, taxing and fiscal policies of the United States."  (SAC ¶ 510(A).)  The SAC alleges that "defendants' military-style assault, unnecessary property destruction, excessive force, unlawful detentions, . . . [and] warrantless searches and seizures," among other things, were all designed "at least partially to retaliate against plaintiffs to punish them for and inhibit future activities protected by the First Amendment." (SAC ¶ 25.)  Judge Pro's October 4, 2004 Order dismissed Plaintiffs' First Amendment retaliation claims against all IRS Agent defendants.  (Pro Order at 9.) Accordingly, Robert Kahre's First Amendment claim survives only insofar as it is asserted against Defendant Damm.

Defendants argue that the SAC's allegations do not satisfy the heightened pleading standard adhered to by the Ninth Circuit when the defendant's subjective intent is an element of the plaintiff's constitutional tort.  (<u>See</u> Doc. # 369 at 5 (quoting <u>Foster v. Skinner</u>, 70 F.3d 1038, 1044 n.7 (9th Cir. 1995)).)  This heightened standard requires plaintiffs to "state in their complaint nonconclusory allegations setting forth evidence of unlawful intent."  <u>Mendocino Envtl. Ctr. v. Mendocino Cnty.</u>, 14 F.3d 457, 464 (9th Cir. 1994).  A person aggrieved by

governmental action "designed to retaliate against and chill political expression" may "'sue the responsible' officers."  Id. (quoting Gibson v. United States, 781 F.3d 1334, 1338 (9th Cir. 1986)).  "[P]laintiffs may not recover merely on the basis of a speculative 'chill' due to generalized and legitimate law enforcement initiatives," but may recover if they allege "discrete acts of police surveillance and intimidation directed solely at silencing them."  Gibson, 781 F.3d at 1338 (internal citation omitted).  Because the defendant's intent to silence the plaintiff and chill his political expression is an element of the claim, the heightened pleading standard applies to First Amendment retaliation claims.  Mendocino, 14 F.3d at 464.

Here, the Court concludes that the SAC does not meet the heightened pleading standard.  It conclusorily alleges that Damm "advised, directed, conspired, combined, confederated and agreed" with every other defendant to violate the Plaintiffs' constitutional rights, "at least partially to retaliate against plaintiffs to punish them for and inhibit future activities protected by the First Amendment." (SAC ¶¶ 3, 25.)  However, it alleges no facts that would support an inference that Damm intended to chill Plaintiff's speech.  Moreover, even Plaintiffs appear to concede that the alleged constitutional violations committed by Damm and his co-conspirators were designed only in part to retaliate against Plaintiffs. (SAC ¶ 25 (asserting that Defendants' actions were "at least partially to retaliate

17

against plaintiffs").)  This is contrary to the Ninth Circuit's directive that plaintiffs may recover for governmental action "directed solely at silencing them."  <u>Gibson</u>, 781 F.3d at 1338.

   In his response in opposition to the instant Motion, Robert Kahre does not address Defendants' argument that the SAC fails to satisfy the heightened pleading standard.  However, Robert Kahre cites to evidence submitted in support of his response and asserts that the evidence establishes: (1) that Defendants Halper and Damm were aware of his views regarding the use of gold and silver coins to avoid income taxes prior to the events of May 29, 2003; and (2) that the Defendants planned the searches and arrest that occurred on May 29, 2003 <u>based on</u> their awareness of those views.  (Doc. # 380 at 12–14.)  Plaintiff maintains that, based on this evidence, "[t]here can be no doubt that the federal defendants' raid was designed to attack and chill Mr. Kahre's belief in use of the gold and silver coinage as legal tender at its dollar denominated face value."  (<u>Id.</u> at 12.)  In other words, Plaintiff appears to be arguing that because he <u>believed</u> that neither he nor his employees had to pay income taxes if they used gold and silver coins as a medium of exchange, any action Defendants took to curb Plaintiff's practice of avoiding income taxes was unlawful, because it chilled his ability to espouse his beliefs by practicing them.  This argument is meritless; criminal activity does not constitute protected expression merely because it stems from beliefs firmly and

18

even sincerely held.  "[S]peech is not protected by the First Amendment when it is the very vehicle of the crime itself."  <u>United States v. Rowlee</u>, 899 F.3d 1275, 1278 (2d Cir. 1990) (quoting <u>United States v. Varani</u>, 435 F.2d 758, 762 (6th Cir. 1970)).

   For the reasons discussed above, the Court concludes that the SAC fails to state a First Amendment retaliation claim against Defendant Damm. Accordingly, that claim is **DISMISSED**.

  B. <u>Fourth and Fifth Amendment Destruction and Deprivation of Property Claims</u>

   In the SAC, Robert Kahre claims damages for alleged violations of his "Fourth Amendment right to be free from illegal searches and seizures of his person, property, and business premises."  (SAC ¶ 510(E).)  The SAC alleges that during the execution of the search warrant at Kimberly Avenue on May 29, 2003, an armored personnel carrier crashed through a closed, but unlocked, chain link gate and slammed into the rear of two trucks parked outside the building.  (SAC ¶ 97.)  No attempt had been made to open the gate without force.  (<u>Id.</u>)  The SAC alleges that during the same search, officers destroyed surveillance cameras mounted on the interior and exterior walls of the 6270 Kimberly Avenue building. (<u>Id.</u> ¶ 98.)  The SAC further alleges that during the search of 6270 Kimberly Avenue, officers forced open a file cabinet with a crow bar and destroyed a lock-

box in a similar fashion, despite both having been left unlocked to avoid damage.
(Id. ¶ 145–146.)

Robert Kahre also claims that he was deprived of his property without
due process of law in violation of the Fifth Amendment.  (SAC ¶ 510(F).)
Specifically, the SAC alleges that officers seized $160,000 in cash; 95 Gold Eagle
Coins; 490 Silver Eagle Coins; 3 silver bars; and 25 boxes of pennies from 6270
Kimberly Avenue, and 210 Silver Eagle Coins from 6295 N. Grand Canyon Drive,
despite the fact that seizure of these items was not authorized by any warrant.  (Id.
¶¶ 472–473.)  According to the SAC, these items were not included on the
inventory listing of all items seized.  (Id. ¶ 471.)  The SAC also alleges that Robert
Kahre received "Receipts for Payment of Taxes" from the IRS in the sum of
$230,913.00 and $154.245.00 after the property was seized.  (SAC ¶¶ 475, 477.)

Defendants assert that they are entitled to dismissal of or judgment on
Robert Kahre's Fourth and Fifth Amendment claims for destruction and
deprivation of his property for a number of reasons.  First, Defendants argue that
Judge Pro's October 4, 2004 Order disposed of Robert Kahre's Fifth Amendment
claim, holding as it did that any claims arising from the assessment and collection
of taxes must be brought pursuant to the statutory remedies provided for by
Congress, not in a Bivens action.  (Pro Order at 11.)  In response, Plaintiff
contends that this portion of the October 4, 2004 Order addressed his Fourth

20

Amendment claims stemming from the alleged illegal seizure of the property, not

his Fifth Amendment due process claims.  (Doc. # 380 at 18.)  Furthermore,

Plaintiff argues, his Fifth Amendment claim does not arise from the assessment

and collection of taxes; in fact, the crux of the claim, according to Plaintiff, is that

the money seized was not applied to his taxes, as evidenced by the discrepancy

between the amount seized and the amount cited on the "Receipts for Payment of

Taxes."  (Id.)  In other words, Plaintiff is not challenging the way in which the

property was seized, or the fact that he had no opportunity to object to the seizure,

but rather the fact that it was essentially stolen from him.

        The Court agrees with Plaintiff that Judge Pro's October 4, 2004

Order explicitly dismissed only Robert Kahre's Fourth Amendment claims arising

from the allegedly illegal seizure of currency.  Judge Pro's reason for dismissing

the Fourth Amendment claims—namely, that Bivens relief is not available for

challenges to IRS tax assessment and collection activities pursuant to Adams v.

Johnson, 355 F.3d 1179, 1181 (9th Cir. 2004)—would apply equally to Plaintiff's

due process claims, if the claims were asserted against IRS Agents and arose from

the assessment and collection of taxes.  However, if—as Plaintiff asserts in his

response to the instant Motion—the SAC states a due process claim based not on

the IRS's seizure of currency for payment of taxes, but rather on the outright theft

of currency by the IRS, FBI, or local law enforcement, the Court is less certain that Adams would bar such a claim.

The Court must, then, determine whether the SAC contains such a claim. Robert Kahre maintains that Paragraphs 471 through 477 of the SAC allege that his money was stolen during the search of 6270 Kimberly Avenue and 6295 N. Grand Canyon Drive and was never accounted for by the IRS. (Doc. # 380 at 18 n.67.) Nowhere among those provisions of the SAC does Robert Kahre explicitly allege that his money was stolen. A person familiar with the value of Gold and Silver Eagle Coins and Silver Bars might be able to glean from the SAC that there was a discrepancy between the amount seized and the amount applied to Robert Kahre's unpaid taxes, but to the uninitiated, Paragraphs 471 through 477 of the SAC appear to allege only that the seizure of Robert Kahre's cash and coinage was unlawful because it was not authorized by a warrant. (See SAC ¶¶ 473, 474.) The Court concludes that the SAC simply does not state a Fifth Amendment due process claim based on the theft of Robert Kahre's money against the remaining defendants. That claim is therefore **DISMISSED**.

Second, Defendants argue that Plaintiff's Fourth Amendment property destruction claims were resolved in Judge Pro's October 4, 2004 Order. As the Court noted above, Defendants maintain that the October 4, 2004 Order must have disposed of the property destruction claims because the alleged property

22

destruction was mentioned in the "Background" section of that Order.  (Doc. # 369

at 8.)  That argument lacks merit.  Defendants also urge the Court to find that

Judge Pro's October 4, 2004 Order implicitly disposed of Plaintiff's property

destruction claim because it was not among the claims Judge Pro explicitly

declined to dismiss.  (Id.)  The Court declines to do so.  Any claim not explicitly

addressed in Judge Pro's October 4, 2004 Order survived that Order.

Next, Defendants argue that Robert Kahre's property destruction

claims are barred by Heck v. Humphrey, 512 U.S. 477 (1994).  In Heck, the

Supreme Court held that:

> [I]n order to recover damages for allegedly unconstitutional
> conviction or imprisonment, or for other harm caused by actions
> whose unlawfulness would render a conviction or sentence invalid, a
> § 1983 plaintiff must prove that the conviction or sentence has been
> reversed on direct appeal, expunged by executive order, declared
> invalid by a state tribunal authorized to make such determination, or
> called into question by a federal court's issuance of a writ of habeas
> corpus . . . .

 512 U.S. at 486–87.  In other words, Heck stands for the proposition that "if a

criminal conviction arising out of the same facts stands and is fundamentally

inconsistent with the unlawful behavior for which section 1983 damages are

sought, the 1983 action must be dismissed."  Smithart v. Towery, 79 F.3d 951, 952

(9th Cir. 1996).  The relevant question, the Supreme Court explained, is whether "a

judgment in favor of the plaintiff [in the § 1983 suit] would necessarily imply the

23

invalidity of his conviction or sentence." <u>Heck</u>, 512 U.S. at 487.  In this case,

success on his Fourth Amendment property destruction claim would not imply the

invalidity of Robert Kahre's conviction; he need not prove any facts that are

"fundamentally inconsistent" with his conviction in order to prevail.  <u>Beets v.

Cnty. of L.A.</u>, 669 F.3d 1038, 1046 (9th Cir. 2012).  Nor would success on his

property destruction claim indicate that evidence seized during the search in

question should have been suppressed at his criminal trial.  The exclusionary rule

applies only when evidence is obtained "as a direct result" of a Fourth Amendment

violation or if evidence is "found to be derivative of an illegality." <u>Segura v.

United States</u>, 468 U.S. 796, 804 (1984).  Here, the allegations do not suggest that

there is any causal connection between the gratuitous destruction of property and

the discovery of evidence.  Excessive or unnecessary destruction of property may

violate the Fourth Amendment although the underlying search was lawful and its

fruits not subject to suppression.  <u>United States v. Ramirez</u>, 523 U.S. 65, 71 (1998).

Accordingly, <u>Heck</u> does not bar Robert Kahre's property destruction claim.

       Finally, Defendants assert that Plaintiff fails to state a claim for

property destruction under Federal Rule of Civil Procedure 12(b)(6).  "The

destruction of property is 'meaningful interference' constituting a seizure under the

Fourth Amendment, because the destruction of property by state officials poses as

much of a threat, if not more, to people's right to be 'secure . . . in their effects' as

does the physical taking of them." <u>Fuller v. Vines</u>, 36 F.3d 65, 68 (9th Cir. 1994),

<u>overruled on other grounds</u>, <u>Robinson v. Solano Cnty.</u>, 278 F.3d 1007, 1013 (9th

Cir. 2002) (internal quotation marks and citations omitted).  As with any seizure

under the Fourth Amendment, "[r]easonableness is the touchstone": courts must

"look to the totality of the circumstances to determine whether the destruction of

property was reasonably necessary to effectuate the performance of the law

enforcement officer's duties."  <u>San Jose Charter of Hells Angels Motorcycle Club</u>

<u>v. City of San Jose</u>, 402 F.3d 962, 975 (9th Cir. 2005).  Here, the SAC alleges that

officers gratuitously destroyed Robert Kahre's property, driving a personnel carrier

through an unlocked gate without attempting to open the gate without force;

smashing surveillance cameras and pulling them out of walls; and prying upon

unlocked file cabinets and lockboxes with a crowbar.  Taking these allegations of

fact as true, the Court concludes that the destruction of property alleged was not

reasonably necessary to effectuate the performance of the officers' duties, and may

therefore have been unreasonable under the Fourth Amendment.

        Defendants do not appear to dispute for purposes of this Motion that

the property destruction alleged in the SAC amounts to a violation of the Fourth

Amendment.  However, Defendants contend that the SAC fails to allege with

sufficient specificity how the three remaining defendants—AUSA Damm, and IRS

Agents Halper and Crowther—caused the alleged property destruction.  (Doc.

# 369 at 10.)  Defendants note that it is undisputed that AUSA Damm was not present at any of the search sites on May 29, 2003 ("First Damm Decl.," doc. # 22 at 128–130 ¶¶ 11–12), and that neither Agent Crowther nor Agent Halper participated in the entries made at any of the search locations ("First Crowther Decl.," doc. # 22 at 137–143 ¶¶ 5, 22; "Halper Decl.," doc. # 22 at 62–81 ¶ 27).  It is true that the SAC does not allege that any of the remaining defendants personally participated in the alleged property destruction—for example, drove a personnel carrier through an unlocked gate or smashed surveillance cameras. However, the SAC alleges that Damm and Halper are responsible for <u>every</u> constitutional violation alleged therein because they planned and directed the conduct complained of.  Specifically, the SAC alleges that Damm and Halper "conspired and agreed . . . to devise an 'operational plan'" to use IRS agents and SWAT team members to illegally seize Robert Kahre's personal property without a warrant, probable cause or any reasonable basis; retaliate against Robert Kahre; "unlawfully and unreasonably execute . . . search warrants"; and unlawfully arrest Robert Kahre.  (SAC ¶ 4.)

The Court concludes that these allegations are sufficient to state a claim for unnecessary property destruction against Defendants Damm and Halper. Defendants Damm and Halper may not be held liable for the constitutional violations of their subordinates—the officers who executed the search warrants—

26

based on a theory of <u>respondeat superior</u>, as that theory is inapplicable to <u>Bivens</u>

actions.  <u>Terrell v. Brewer</u>, 935 F.2d 1015, 1018 (9th Cir. 1991).  However, a

supervisor may be held liable for the violations of his subordinates "if the

supervisor participated in or directed the violations . . . ."  <u>Taylor v. List</u>, 880 F.2d

1040, 1045 (9th Cir. 1989).  Since the SAC alleges that Damm and Halper together

devised a plan whereby they directed the officers who executed the search warrants

to commit the constitutional violations alleged in the SAC, it states a claim for

unnecessary property destruction against them.

However, the SAC does not state a claim for property destruction

against Crowther.  The SAC does not allege that Crowther personally participated

in the unnecessary property destruction, or directed any other officers to destroy

Robert Kahre's property.  It asserts that Crowther conspired with the other

defendants named in the SAC to violate Plaintiffs' "clearly established

constitutional rights" (SAC ¶ 6), but it does not allege any facts regarding the

scope of the alleged conspiracy or the manner in which it operated.  This allegation

is too vague and conclusory for the Court to reasonably infer that Crowther could

be responsible for violations committed by another defendant by virtue of the

alleged "conspiracy."  <u>See</u> <u>Burns v. Cnty. of King</u>, 883 F.2d 819, 821 (9th Cir.

1989) ("To state a claim for a conspiracy to violate one's constitutional rights

under section 1983, the plaintiff must state specific facts to support the existence of the claimed conspiracy.").

Defendant's Motion is, therefore, **DENIED WITHOUT PREJUDICE** to the extent it seeks dismissal of Robert Kahre's Fourth Amendment property destruction claim against Defendants Damm and Halper, and **GRANTED** insofar as it seeks dismissal of the same claim against Defendant Crowther.

C.    Fourth Amendment Unlawful and Unreasonable Detention Claims

In the SAC, Robert Kahre alleges that he was unreasonably and unlawfully detained following his arrest at Bank of the West on May 29, 2003. (SAC ¶¶ 510(C) and (D).)  Defendants point out that Plaintiff's only basis for arguing that his detention was unreasonable and unlawful is that the arrest preceding the detention was unlawful.  (Doc. # 369 at 11.)  The Court has already ruled in Defendants' favor on Robert Kahre's unlawful arrest claim.  (See Docs. ## 319, 354.)  Accordingly, Defendants contend, his unlawful and unreasonable detention claims must also fail.  (Doc. # 369 at 11.)  In response, Robert Kahre appears to concede that, given the Court's holding that his arrest was lawful, he cannot prevail on his claims for unlawful and unreasonable detention.  (Doc. # 380 at 26.)  However, he maintains that his arrest and subsequent detention were unlawful and indicates that he intends to contest the Court's ruling on his unlawful

arrest claim on appeal.  (Doc. # 380 at 26.)  Robert Kahre's unlawful and
unreasonable detention claims are, therefore, **DISMISSED**.

     D.    <u>"Unlawful Planning" Claims</u>

     The SAC does not state a stand-alone claim for "unlawful planning";
rather, as the Court discussed above, Robert Kahre asserts that Damm and Halper
are responsible for <u>every</u> constitutional violation alleged in the SAC because they
planned and directed the conduct complained of.  Robert Kahre has one substantive
claim remaining: his claim for property destruction in violation of the Fourth
Amendment.  Thus, Plaintiff's "unlawful planning" claim exists insofar as it is a
means by which Plaintiff may seek to hold Damm and Halper liable for the alleged
property destruction.

     Defendants argue that this claim must be dismissed because all
underlying substantive claims have been dismissed.  (Doc. # 369 Ex. 1 at 12.)  This
argument fails; the Court has concluded that Plaintiff's claim for unnecessary
property destruction survives.  Defendants also complain that a holding in
Plaintiff's favor on his "unlawful planning" claim will allow Plaintiff to seek
discovery from Damm—"an extraordinary event," according to Defendants, "given
that AUSA Damm was one of the Government attorneys who prosecuted [Plaintiff]
in [his] criminal case . . . ."  (Doc. # 386 at 2.)  Defendants assert that "Mr. Kahre
has been unfairly attacking AUSA Damm for many years in the instant civil case

and in the criminal case in an attempt to further his interests," and maintain that "discovery [regarding Mr. Damm] would be a fishing expedition that is not warranted by the facts."  (<u>Id.</u>)  The Court reminds Defendants that it has <u>already ordered</u> that Plaintiff be permitted to take discovery regarding the extent to which Damm was involved in planning the searches on May 29, 2003.  (Doc. # 300 at 28.)  In this Court's September 2, 2011 Order, it granted Plaintiffs a Rule 56(d) continuance, finding that there was a "dearth of evidence on the record" (<u>id.</u> at 25) and concluding that Defendants were not entitled to summary judgment on the unlawful planning issue despite Defendant Damm's self-serving declarations that he did not participate in planning the "unlawful raid" (<u>id.</u> at 27–28).  The Court is not convinced that it would so unjust or prejudicial to permit Damm to be deposed that it must dismiss an otherwise valid claim because it is asserted against him.

Accordingly, the Court concludes that Plaintiff must be permitted to take discovery regarding the extent to which Damm and Halper were involved in planning the execution of the search warrant at 6270 Kimberly Avenue that resulted in the alleged gratuitous destruction of property.  The Court is not authorizing a fishing expedition; discovery is limited to those matters germane to Plaintiff's sole remaining claim.  Plaintiff may depose Damm and Halper for the <u>very limited purpose</u> of determining whether they directed the property destruction that occurred during the execution of the search warrant at 6270 Kimberly Avenue.

Other discovery sought from Defendants must be similarly limited in scope.  If the evidence fails to establish that Damm and Halper directed any property destruction, Defendants may renew their motion for summary judgment and the Court will enter judgment in Defendants' favor on Plaintiff's last remaining claim.

II.  <u>Defendants' Motion for Summary Regarding the Remaining Claim of Plaintiffs Lori Kahre and Lee Belcher</u>

The SAC alleges that Defendants violated the Fourth Amendment rights of Plaintiffs Lori Kahre and Belcher by searching their home without a warrant (SAC ¶¶ 488(F), 504(F)); detaining them unreasonably and unlawfully (<u>id.</u> ¶¶ 488(C), 488(D), 504(C), 504(D)); using excessive force (<u>id.</u> ¶¶ 488(E), 504(E)); and destroying their property (<u>id.</u> ¶¶ 488(I), 504(I)).  Specifically, Belcher claims that on May 29, 2003, at approximately 4:30 p.m., he was inside his home—the secondary unit at 6295 N. Grand Canyon Avenue ("the secondary unit")—when he heard noises outside.  (<u>Id.</u> ¶¶ 293, 294.)  According to Belcher, when he stepped outside, members of a SWAT team pointed guns at him, and although he complied with their orders, they shot him once in the back and twice in the stomach with non-lethal bags.  (<u>Id.</u> ¶¶ 295–300.)  Belcher alleges that he was tackled, thrown to the ground, dragged down a rocky embankment to the primary unit at 6295 N. Grand Canyon Avenue, and then detained in handcuffs on the porch of the primary unit.  (<u>Id.</u> ¶¶ 301–303.)  He claims that while he was detained, officers were

searching the secondary unit, and detonated a "flash-bang," which caused damage inside the dwelling.  (Id. ¶¶ 317, 327, 328.)  According to Belcher, he was eventually given a choice between leaving the property, unrestrained, or remaining on the property, handcuffed.  (Id. ¶ 321.)  He chose the latter.  (Id.)  Belcher asserts that they had no legal authority to search the secondary unit, keep him in handcuffs, or prevent him from returning to his home.  (Id. ¶ 322.)

Lori Kahre alleges that she was also in the secondary unit at 4:30 p.m. on May 29, 2003, when members of a SWAT team ordered her to come outside with her hands up.  (Id. ¶¶ 345–349.)  She claims that the officers handcuffed her, one of them "threw her up against a cinder block wall," and then they dragged her through rocks and gravel to the front porch of the primary unit.  (Id. ¶¶ 351–352.)  Paramedics treated wounds on her chin, shoulder, neck and elbow.  (Id. ¶ 357.)  Eventually, she alleges, the officers took her back to her house, still handcuffed.  (Id. ¶ 362.)  She claims that she was detained in her home by the officers until 10:30 p.m., when they "completed their raid."  (Id. ¶¶ 373, 376.)

The SAC named the following defendants: AUSA Damm; IRS Agents Halper, Mercedes Manzur, and Dennis Crowther ("Crowther"); and officers with the NLVPD.  As the Court noted above, the claims asserted against NLVPD officers were dismissed by the Court in a May 22, 2006 Order.  (Doc. # 142.)  Thus, although Lori Kahre and Belcher's Fourth Amendment claims were asserted

against IRS Agent Crowther—the only federal defendant present during the May 29, 2003 raid at 6295 N. Grand Canyon Avenue—and various NLVPD officers, only the claims against Crowther remain viable.  Defendants now move for summary judgment on Belcher and Lori Kahre's Fourth Amendment claims against Crowther.  They also move for summary judgment on the "unlawful planning" claims asserted against AUSA Damm and IRS Agent Halper,[2] to the extent they are based upon the Fourth Amendment violations alleged by Belcher and Lori Kahre.

Defendants advance several arguments in favor of summary judgment.  First, although there is no dispute that the SWAT team did not have a warrant to conduct a search of Belcher and Lori Kahre's home—the secondary unit at 6295 N. Grand Canyon Avenue—Defendants call the SWAT team's entry of the secondary unit a "protective sweep," and contend that it was therefore justified although not authorized by a warrant.  (Doc. # 350 at 10.)  Second, Defendants point out that this very Court upheld the lawfulness of the warrantless entry in Robert and Lori Kahre's criminal trial (Cr. 2:05–CR–00121–DAE–RJJ, Doc.

---

[2]  Defendants' Motion for Summary Judgment Regarding the Remaining Claim of Plaintiffs Lori Kahre and Lee Belcher does not address the unlawful planning claims asserted against Halper, most likely because it was not clear prior to the issuance of this Order that the claims asserted against Halper survived.  However, as the Court has concluded that the SAC adequately alleges that Halper, together with Damm, planned the unlawful conduct complained of, the Court will address the unlawful planning claim asserted against Halper as well.

# 2411), and argue that Plaintiffs are therefore barred from relitigating the issue. (Doc. # 350 at 9–10.)  Third, Defendants assert that Plaintiffs are also barred from challenging the constitutionality of the SWAT team's actions at the secondary unit pursuant to Heck v. Humphrey, 512 U.S. 477, 486–87 (1994).  Fourth, Defendants maintain that Lori Kahre and Belcher's claims against Crowther fail because the evidence demonstrates that Crowther was not involved in any search of the secondary unit, in the use of force against Belcher or Lori Kahre, or in the destruction of property, and neither Lori Kahre nor Belcher were detained against their will.  Finally, Defendants argue that, since the underlying Fourth Amendment claims are without merit, the claims against Damm and Halper must also fail.  The Court will address each of Plaintiffs' Fourth Amendment claims in turn.

    A.    Illegal Search

        As the Court noted above, there is no dispute that NLVPD officers entered the secondary unit on May 29, 2003 without a warrant.  Defendants contend that the SWAT team's entry of the secondary unit was a "protective sweep," and was therefore justified although not authorized by a warrant.  (Doc. # 350 at 10.)  Defendants also point out that this Court upheld the lawfulness of the warrantless entry in Robert and Lori Kahre's criminal trial (see Cr. 2:05–CR–00121–DAE–RJJ, doc. # 2411), and assert that the doctrine of collateral estoppel therefore bars Plaintiffs from relitigating this issue.  The Court agrees.  "Under

collateral estoppel, once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case." Allen v. McCurry, 449 U.S. 90, 94 (1980).  When considering the preclusive effect of a prior federal court judgment, federal law controls the analysis. McQuillion v. Schwarzenegger, 369 F.3d 1091, 1096 (9th Cir. 2004).  Three factors must be considered: (1) whether the issue at stake is identical to the one alleged in the prior litigation; (2) whether the issue was actually litigated by the party against whom preclusion is asserted in the prior litigation; and (3) whether the determination of the issue in the prior litigation was a critical and necessary part of the judgment.  Id.

         In this case, all three factors are satisfied.  The legality of the officers' warrantless entry of the secondary unit was challenged by Robert and Lori Kahre in a motion to suppress in the related criminal case (Cr. 2:05–CR–00121–DAE–RJJ, docs. ## 2136, 2164), and Lori Kahre had an opportunity to argue the motion, through counsel, at a suppression hearing (id., doc. # 2411 at 2).  Although Lee Belcher was not actually a party to the earlier action, "[c]ourts have recognized that a non-party may be bound if a party is so closely aligned with its interests as to be its 'virtual representative.'" Schoenleber v. Harrah's Laughlin, Inc., 423 F. Supp. 2d 1109, 1112 (D. Nev. 2006).  "A close relationship between the named party and the nonparty supports a finding of virtual representation," and "[a]n

35

identity of relevant interests between the named party and the non-party is necessary to such a finding." Irwin v. Mascott, 370 F.3d 924, 930 (9th Cir. 2004). Belcher had and continues to have a close relationship with Lori Kahre. At the time that the search occurred and at the time of the suppression hearing in the criminal case, Belcher and Lori Kahre were in a romantic relationship and shared a home. Moreover, Lori Kahre's interests in the prior action are identical to Belcher's interests in this action; she had a tremendous incentive to convince the Court that the warrantless entry was illegal so that any evidence derived therefrom would be suppressed. Plaintiffs are therefore collaterally estopped from relitigating the illegal search issue in this case.[3]

In any event, even if the Court were to reach the merits of this claim, Defendants would be entitled to summary judgment for the same reason the Court upheld the legality of the warrantless entry in the related criminal action. "In executing a search warrant officers may take reasonable action to secure the premises and to ensure their own safety and the efficacy of the search." L.A. Cnty., Cal. v. Rettele, 550 U.S. 609, 614 (2007). They may conduct a protective sweep of an area if "specific and articulable facts support[] [the] belief that . . . dangerous persons may be in the building or elsewhere on the premises." United

---

[3] As the Court did not address Lori Kahre's allegations of excessive force, property destruction, or unreasonable detention in the criminal action, the doctrine of collateral estoppel does not bar Lori Kahre and Belcher's litigation of those claims in this case.

36

States v. Murphy, 516 F.3d 1117, 1120 (9th Cir. 2008) (quoting United States v. Delgadillo-Velasquez, 856 F.2d 1292, 1298 (9th Cir. 1988)).  In this case, the officers had sufficient reason to believe that a protective sweep was necessary. The affidavit filed in support of the search warrant set forth reasons for concern for the physical safety of the law enforcement officers involved in the investigation. The main reason for concern was a letter written by Robert Kahre and sent to IRS Agent Manzur on August 7, 2000.  (Doc. # 381 Ex. B.)  The letter stated that Robert Kahre had "armed security details" at several properties at which he conducted business.  (Id.)  It also stated that Robert Kahre did not recognize the legitimacy of IRS agents as law enforcement personnel.  (Id. ("I am put in the awkward position of not being able to recognize the [IRS] agents' authority . . . .").)  Robert Kahre noted, in the letter, that he was making these observations because he wanted "to be sure [to] avoid even the remotest possibility of physical injury, harm, or loss of life to anyone."  (Id.)  In light of this letter, it was reasonable for law enforcement officers executing the search warrant at 6295 N. Grand Canyon Drive to believe that individuals on the premises might be armed and unwilling to submit to their authority.  Accordingly, the protective sweep of Lori Kahre and Belcher's home was justified under the circumstances.

Finally, even if the warrantless entry was unreasonable and the claim was not barred by the doctrine of collateral estoppel, Plaintiffs' illegal search claim

would fail to the extent it is asserted against Defendant Crowther.  Defendants have submitted evidence demonstrating that the search—or "sweep"—of the secondary unit was carried out by NLVPD officers, not by Crowther.  Captain Justin Roberts of the NLVPD, who was a member of the SWAT team tasked with securing 6295 N. Grand Canyon Drive on May 29, 2003, submitted a Declaration in support of Defendants' Motion for Summary Judgment, which states that "[a]ll of the individuals who were on the team that was involved in the protective sweep of the [secondary unit] on May 29, 2003 were employed by the North Las Vegas Police Department."  (Doc. # 351 ¶ 8.)  Thus, there is no genuine issue for trial regarding Crowther's participation in the challenged conduct.

      B.    <u>Excessive Force</u>

         The "use of force is contrary to the Fourth Amendment if it is excessive under objective standards of reasonableness."  <u>Saucier v. Katz</u>, 533 U.S. 194, 202 (2001).  Reasonableness is assessed by balancing "[t]he force which [i]s applied . . . against the need for that force."  <u>Deorle v. Rutherford</u>, 272 F.3d 1272, 1279 (9th Cir. 2001).  "In determining the need for force, we pay 'careful attention to the facts and circumstances of [the] particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight.'"  <u>Meredith v. Erath</u>, 342 F.3d 1057, 1061 (9th

38

Cir. 2003) (quoting <u>Graham v. Connor</u>, 490 U.S. 386, 396 (1989)).  The

reasonableness of force used is ordinarily a question of fact for the jury, but a

district court may grant summary judgment to an officer if it determines that the

use of force was objectively reasonable under the circumstances.  <u>See</u> <u>Liston v.

Cnty. of Riverside</u>, 120 F.3d 965, 976 n.10 (9th Cir. 1997).

 With respect to Belcher's excessive force claim, the following facts

are undisputed.  Belcher was ordered to exit his house and walk towards the

SWAT team with his hands in the air, and he complied.  (Doc. # 352 Ex. 6.)  When

he was 15 feet away from the officers, he demanded to see a search warrant, and

refused several orders to approach and several orders to lie down on the ground.

(<u>Id.</u>)  According to Captain Roberts's report, "[b]ecause [the officers] knew other

subjects were inside the residence, and [their] initial information included possible

machine guns, Belcher['s] noncompliance was creating a safety hazard to himself,

and officers."  (Doc. # 351 Ex. 1.)  The officers shot Belcher with an air-propelled

pepper ball gun three times (<u>id.</u>) until he crouched down (doc. # 352 Ex. 6).

"Fearing that Mr. Belcher was about to run back into the house," the officers "took

hold of [him] by the wrists" and "ordered [him] to get on the ground," at which

point they "pulled [him] out past the entry team."  (<u>Id.</u>)

 "[T]he most important single element" when assessing the

reasonableness of the use of force is "whether the suspect poses an immediate

threat to the safety of the officers or others."  Chew v. Gates, 27 F.3d 1432, 1441 (9th Cir. 1994).  Here, the officers were investigating income tax related crimes, which are nonviolent offenses.  However, as the Court discussed above, the officers had reason to believe that there might be an armed security detail at 6295 N. Grand Canyon Drive—an armed security detail that did not recognize the lawful authority of IRS agents, who were directing the investigation.  The evidence indicates that Belcher himself did not pose an immediate threat to the safety of the officers or others; he had complied with the officers' order to put his hands in the air, and had exited the house and walked toward them as directed.  However, his continued refusal to approach the officers or to lie on the ground prolonged both his and the officers' exposure to risk from individuals still inside the home.  Thus, the officers' reasonable safety concerns warranted the use of a non-lethal pepper ball gun to bring Belcher under the officers' control.  Cf. Headwaters Forest Defense v. Cnty. of Humboldt, 276 F.3d 1125, 1130 (9th Cir. 2002) (holding that the use of  pepper spray "may be reasonable as a general policy to bring an arrestee under control") (quoting LaLonde v. Cnty. of Riverside, 204 F.3d 947, 961 (9th Cir. 2000)).

          As for Lori Kahre's claim, the following facts are not in dispute.  Lori Kahre was ordered to exit her house and approach the SWAT team with her hands in the air, and she complied.  (Doc. # 352 Ex. 6.)  When she reached the officers,

they ordered her to turn away from them and she said "why?" and lowered her

arms.  (Id.)  Two officers then "took hold of [her] wrists and arms and [escorted]

her past the entry team."  (Id.)  While they were escorting her, she demanded to see

a search warrant, and when one of the officers told her to calm down and placed

her hands behind her back, she said "No, I wanna see the search warrant!" and

"began trying to break free . . . by twisting her arms around and pulling away from

[the officers]."  (Id.)  At that point, the officers attempted to place her up against a

wall "to gain more control of her," and she "put her right foot up onto the wall and

began to push her body back towards" them."  (Id.)  One officer pushed Lori

Kahre's leg down with his right hand and both pushed her up against the wall.

(Id.)  While pushed up against the wall, she moved around rapidly and attempted to

break away.  (Id.)  She suffered a scratch on her shoulder and an abrasion on her

chin from being placed up against the wall.  (Id.)  The Court concludes that the

officers used objectively reasonable force to subdue Lori Kahre.  Lori Kahre

resisted more actively than Belcher; she physically struggled with the officers,

attempting to break free and pushing against a wall with her foot.  The officers did

not push her up against the wall—the action that ultimately led to her injuries—

until she began trying to break free, and the injuries she suffered were apparently a

result of the struggle.

For the reasons stated above, the Court concludes that Defendants are entitled to summary judgment as a matter of law on Plaintiffs' excessive force claims. The Court also notes that, even if the officers had not used objectively reasonable force to subdue Belcher and Lori Kahre, Plaintiffs' claims would fail insofar as they are asserted against Crowther. Again, the evidence demonstrates that <u>only</u> NLVPD officers, not Crowther, were involved in ordering Belcher and Lori Kahre to exit the secondary unit and subsequently subduing them. (Doc. # 351 ¶ 8, 10; Doc. # 352 Ex. 1, 6.)

     C.    <u>Unlawful Detention</u>

Turning to Plaintiffs' unlawful detention claims,[4] Belcher and Lori Kahre argue that Defendants had no authority to detain them during the execution of the search warrant on May 29, 2003. Belcher's claim fails, as he admits that at approximately 5 p.m., he was told that he could stay at 6295 N. Grand Canyon Drive, in handcuffs, or could leave the premises. (SAC ¶ 321; "Belcher Depo.," Doc. # 352 Ex. 5 at 32–33.) He chose to leave. (Belcher Depo. at 33:4.)

As for Lori Kahre, she was brought back to the secondary unit at 5 p.m., still handcuffed. (SAC ¶ 62; "Lori Depo.," Doc. # 352 Ex. 4 at 41:16–17.)

---

[4] Belcher and Lori Kahre each asserted claims for unreasonable detention and unlawful detention. The unreasonable detention claims stem from the period of time during which they were handcuffed and made to wait on the front porch of the primary unit, and were dismissed in Judge Pro's October 4, 2004 Order. (Pro Order at 18.) Accordingly, only the claims for unlawful detention survive.

Defendant Crowther and a number of NLVPD officers were present at the secondary unit when she arrived. (Lori Depo. at 50:7–12.) Defendant Crowther's Declaration, submitted in support of Defendant's Motion for Summary Judgment, states that he "was instructed to go to Lori Kahre's residence" (the secondary unit) "and 'monitor [Ms. Kahre] for law enforcement officer safety reasons' until the search of the primary residence at [6295 N. Grand Canyon Drive] was completed." ("Crowther Decl.," Doc. #350 Ex. 3 ¶ 3.) Lori Kahre's handcuffs were removed approximately fifteen minutes after she was escorted to the secondary unit. (Lori Depo. at 49:21–25.) According to Sergeant Donald Collins of the NLVPD, after her handcuffs were removed, she was told that she was free to leave and was not under arrest, but she indicated that she wanted to stay in the house. ("Collins Decl.," Doc. # 350 Ex. 4 ¶ 7.) During her deposition, Lori Kahre stated that she did not recall anyone telling her she had to stay in the house (Lori Depo. at 70:15–17), and admitted that the officers "could have" told her she was free to leave, but she didn't remember, and in any event she "wouldn't have left, not without [her] animals and not knowing what's going on in [her] house" (id. at 62:17–19, 70–71). Accordingly, from approximately 5 p.m. to 10:30 p.m., Lori Kahre sat in the kitchen of the secondary unit. (Lori Depo. at 66:14–23.) When she had to go to the bathroom, a female officer escorted her. (Id. at 70:20–21.) Several NLVPD officers sat on her couch watching television, and Defendant Crowther stood in the

43

kitchen with her talking about various things, such as the high school they both

attended.  (Id. at 67–68, 73:24–25.)  According to Lori Kahre, Crowther was the

"only one that was decent to [her]"; he helped her treat her wounds, and let her

drink rum and 7-Up.  (Lori Depo. at 50–51, 69:20–22.)

        As a threshold matter, the Court must determine whether Lori Kahre

was "seized" within the meaning of the Fourth Amendment.  If no seizure

occurred, the officers' conduct plainly did not violate her Fourth Amendment right

to protection from "unreasonable searches and seizures."  U.S. Const. amend. IV.

A person is seized when an officer, "by means of physical force or show of

authority, terminates or restrains his freedom of movement," Brendlin v.

California, 551 U.S. 249, 254 (2007) (internal quotation marks omitted), such that

"a reasonable person would have believed that he was not free to leave," United

States v. Mendenhall, 446 U.S. 544, 554 (1980).  The Supreme Court has said that

the "crucial test is whether, taking into account all of the circumstances

surrounding the encounter, the police conduct would 'have communicated to a

reasonable person that he was not at liberty to ignore the police presence and go

about his business.'"  Florida v. Bostick, 501 U.S. 429, 437 (1991) (quoting

Michigan v. Chesternut, 486 U.S. 567, 569 (1988)).

        Here, there is no genuine dispute that Lori Kahre was free to leave her

home on the evening of May 29, 2003.  Sergeant Collins's Declaration states that

she was told she was not under arrest and was free to leave; her own deposition testimony confirms that she does not recall being told that she had to stay in the house, and "could have" been told she was free to leave; and Belcher, a co-occupant of the home, was permitted to leave.  Under these circumstances, a reasonable person would have understood that she was free to leave.  However, the fact remains that, having chosen to stay in her home, Lori Kahre's freedom was restricted.  She was escorted to her home in handcuffs, and remained handcuffed for fifteen minutes inside the house.  Once the handcuffs were removed, she was "[t]old to sit there" in the kitchen on a barstool (Lori Depo. at 65:11), and was not permitted to walk freely around the house by herself; Defendant Crowther accompanied her when she went looking for her cats (id. at 56:2–5), and fetched cold rags for her to tend to her wounds, because she was not allowed to leave the room alone (id. at 50–51).  Her deposition testimony suggests that she had to ask permission to make herself a mixed drink (id. at 69:22 ("Dennis let me make it.")), and was accompanied to the bathroom by a female officer (id. at 70:20–21).  No reasonable person would have felt at liberty to ignore the police presence and go about her business under these circumstances.  The Court concludes that Lori Kahre was seized within the meaning of the Fourth Amendment.

In general, a seizure—even one that does not amount to a formal arrest—is reasonable under the Fourth Amendment only if supported by probable

cause.  See Dunaway v. New York, 442 U.S. 200, 213 (1979).  Here, there is no suggestion that the officers had probable cause to arrest Lori Kahre.  However, the Supreme Court has recognized that certain seizures that are significantly less intrusive than a formal arrest may withstand scrutiny under the general reasonableness standard embodied in the Fourth Amendment even when not supported by probable cause.  Michigan v. Summers, 452 U.S. 692, 697 (1981).

One well-established exception to the general rule is that "police may detain a building's occupants while officers execute a search warrant as long as the detention is reasonable."  Dawson v. City of Seattle, 435 F.3d 1054, 1065 (9th Cir. 2006); see also Summers, 452 U.S. 692, 705 (1981) ("If the evidence that a citizen's residence is harboring contraband is sufficient to persuade a judicial officer that an invasion of the citizen's privacy is justified, it is constitutionally reasonable to require that citizen to remain while officers of the law execute a valid warrant to search his home.").  This is so "because the character of the additional intrusion caused by detention is slight"—the detention itself is less intrusive than the search—and "because the justifications for detention are substantial."  Muehler v. Mena, 544 U.S. 93, 98 (2005).  In other words, the important law enforcement interests served by detaining the occupants of a building being searched outweigh the detainees' privacy rights.

Courts have also upheld the detention of individuals located outside the area where a search warrant is to be executed, but within a secure perimeter or close enough to pose a danger to the officers executing the warrant.  For example, in United States v. Allen, 618 F.3d 404, 405–06, 409–10 (3d Cir. 2010), the court held that it was reasonable for officers executing a search warrant inside a bar to detain Allen, who was working as a security guard for the bar and was found standing on the sidewalk outside when the officers arrived.  The officers detained Allen "just long enough to ensure [their] safety and . . . to gather the evidence they were seeking."  Id.  Similarly, in United States v. Jennings, 544 F.3d 815, 818 (7th Cir. 2008), the court concluded that it was reasonable for officers to briefly detain Jennings, although he "never stepped onto the property being searched," because "he entered the security perimeter surrounding the apartment where the narcotics search was underway."

Here, the Court concludes that the officers' detention of Lori Kahre was reasonable under the circumstances.  United States v. Enslin, 327 F.3d 788, 796 (9th Cir. 2003) ("Any inquiry into the reasonableness of a seizure requires 'a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake.'") (quoting Graham v. Connor, 490 U.S. 386, 396 (1989)).  She was not an occupant of the building being searched, so the existence of the search warrant did

47

not provide "objective justification" for her detention as it did in <u>Summers</u>.

<u>Summers</u>, 452 U.S. at 703 ("The existence of a search warrant . . . provides an

objective justification for the detention.  A judicial officer has determined that

police have probable cause to believe that someone in the home is committing a

crime."); <u>see also</u> <u>Mena</u>, 544 U.S. at 98 (observing that the existence of a warrant

ensures that "a neutral magistrate has determined that probable cause exists to

search the home"). However, the secondary unit was a very short distance from the

primary unit (Lori Depo. at 13–14), and within the area the SWAT team had

secured.  The occupant of the secondary unit—Lori Kahre—was the sister and

employee of the principal target of the investigation.  The officers had a legitimate

interest in ensuring their own safety during the search of the primary unit, and they

did so by giving Lori Kahre the choice to leave the secure site or remain under

watch.  As the Supreme Court observed in <u>Summers</u>, "[t]he risk of harm to both

the police and the occupants is minimized if the officers routinely exercise

unquestioned command of the situation."  425 U.S. at 702–03.

   For the reasons stated above, Defendants are entitled to summary

judgment as to Plaintiffs' claims for unlawful detention.

  D. <u>Property Destruction</u>

   Finally, it is undisputed that the SWAT team caused damage when

they entered the secondary unit.  According to Captain Roberts of the NLVPD,

after Lori Kahre and Belcher exited the house, the SWAT team noticed a dog inside.  (Doc. # 351 ¶ 12.)  The officers tossed a blast distraction device into the house to distract the dog.  It ended up on the kitchen floor, and when it went off it caused damage to the tile floor—one tile, about eight inches in diameter, was discolored and had holes in it.  (Id.; Lori Depo. at 53–54; Doc. # 351 Exs. 2, 3.) The blinds and sliding glass window in the kitchen were also damaged.  (Lori Depo. at 54:15–18.)  Finally, sliding glass closet doors in Lori Kahre and Belcher's bedroom had been taken off their track.  (Id. at 56–57; Doc. # 351 Ex. 4.)

As the Court noted above in its discussion of Robert Kahre's property destruction claim, whether government destruction of property violates the Fourth Amendment turns on whether the destruction of property was reasonably necessary to effectuate the performance of the law enforcement officers' duties.  See San Jose Charter of Hells Angels Motorcycle Club, 402 F.3d at 975.  The Court concludes that the amount of damage caused by the officers in this case was reasonably necessary to achieve the objectives of the protective sweep: ensuring officer safety and securing the premises in preparation for execution of the search warrant.  The blast distraction device was thrown into the house for a legitimate reason—to distract the dog—and the damage it caused was fairly minor; photographs of the tile floor show small holes in one tile and slight discoloration on surrounding tiles.  The sliding glass doors in the bedroom had merely been

49

taken off their tracks.  Thus, the damage was not severe, and there is no indication that it was gratuitous.  Accordingly, the Court concludes that Defendants are entitled to judgment as a matter of law on Lori Kahre and Belcher's property destruction claims.

In conclusion, the Court **DISMISSES** Lori Kahre and Lee Belcher's illegal search claim as barred by the doctrine of collateral estoppel, and **GRANTS** Defendants summary judgment on Plaintiffs' three remaining claims.  Lori Kahre, Lee Belcher, and Defendant Crowther are therefore **DISMISSED** from this case.

III.   Defendants' Motion to Strike

On August 17, 2012, Plaintiffs Lori Kahre and Lee Belcher submitted an Expert Witness Report prepared by Robert Clymer ("Clymer"), a former FBI Agent.  (Doc. # 336 Ex. 4.)  On September 6, 2012, Defendants moved to strike Clymer's expert report and testimony.  (Doc. # 336.)  As this Order disposes of Lori Kahre and Lee Belcher's last remaining claims, the Court **DENIES AS MOOT** Defendants' Motion to Strike.

CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendants' Motion for Summary Judgment (doc. # 350), and **GRANTS IN PART** and **DENIES WITHOUT PREJUDICE IN PART** Defendants' Motion to Dismiss or, in the Alternative, for Summary Judgment (doc. # 369).  Plaintiff Robert Kahre's First

Amendment Retaliation Claim and Fourth Amendment Unlawful and

Unreasonable Detention Claims are **DISMISSED**.  Defendants are entitled to

judgment on Plaintiffs Lori Kahre and Lee Belcher's illegal search, unlawful

detention, property destruction, and excessive force claims.  Defendant Crowther,

Plaintiff Lori Kahre, and Plaintiff Lee Belcher are **DISMISSED** from the case.

The Court **DENIES AS MOOT** Defendant's Motion to Strike.  (Doc. # 336.)

IT IS SO ORDERED.

DATED:  San Antonio, Texas, August 9, 2013.

_____
David Alan Ezra
Senior United States District Judge